## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

Case No. 18-cr-265 (ADM/SER)

Plaintiff,

v.

**REPORT AND
RECOMMENDATION**

Syed Ben Al-Amin,

Defendant.

Jeffrey S. Paulsen, United States Attorney's Office, Minneapolis, Minnesota (for Plaintiff); and

Robert D. Richman, RD Richman Law, St. Louis Park, Minnesota (for Defendant).

STEVEN E. RAU, United States Magistrate Judge

The above-captioned case comes before the undersigned on Defendant Syed Ben Al-Amin's Motion to Suppress Statements, Admissions, and Answers (ECF No. 19) and Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 20). This matter was referred for resolution of pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, this Court recommends the motions be denied.

## I.    BACKGROUND

On August 6, 2018, Minneapolis Police Officers Paul Gillies and Ryan Keyes responded to a 911 call from a woman about her husband following her. (December 20, 2018 Corrected Motions Hearing Transcript ("Tr."), at 7–8, ECF No. 38). The caller was

Al-Amin's estranged wife, Rachelle Al-Amin. (Tr. 39). She stated she had a no-contact order against Al-Amin and that he was following her car in his car. (Tr. 8–9). Rachelle[1] stated both parties had pulled over in the area of 12th Avenue North and Fremont Avenue North, and that she was sitting in her car. (Tr. 9).

Officer Gillies arrived at the scene around 1:24 p.m. (Tr. 9). Officer Gillies observed Al-Amin's car parked behind Rachelle's car and saw Al-Amin standing by Rachelle's car window "yelling and screaming at her." (Tr. 10). Officer Gillies then saw Al-Amin punch the driver's side window of Rachelle's car. (Tr. 11). Rachelle reacted by driving her car forward "probably 30 feet or so" and stopped her car again. (Tr. 11–12).

At this point, Al-Amin walked toward the passenger side of his car. (Tr. 12). Officer Gillies got out of his squad car with his gun raised and ordered Al-Amin to get out of the passenger side of the car, put his hands up, and to come towards Officer Gillies. (Tr. 12). Officer Gillies testified that while giving orders, Al-Amin started "going through his pockets" and it looked "like he was trying to hide something." (Tr. 13). Officer Gillies saw "rapid movements with [Al-Amin's] arms" and testified that Al Amin "was moving around frantically inside the vehicle." (Tr. 25). Officer Gillies thought this lasted about thirty seconds but admitted the time-span may have been shorter. (Tr. 13, 27). Officer Gillies requested help with the situation. (Tr. 13–14). Al-Amin got out of his car and walked around to the driver's side of his car (Tr. 13). Officer Gillies was concerned Al Amin "was going to drive away, or try and flee." (Tr. 14). Officer Gillies had his gun out and was

---

[1] Because Defendant Al-Amin and Rachelle Al-Amin share a last name, the Court refers to Rachelle Al-Amin by her first name to avoid confusion.

giving Al-Amin orders to get out of his car while he was trying to get into the driver's side of the car as well. (Tr. 14).

Officer Keyes pulled up while Al-Amin was in the driver's side of the car. (T. 39; Def. Ex. 1 at 1:19). Officer Gillies testified he did not see Al-Amin reaching for the glove box or making any movements suggesting he was hiding something while on the driver's side. (Tr. 29). Officer Keyes testified Al-Amin made furtive arm movements while on the driver's side of the car and appeared to be trying to hide something. (Tr. 45). Officer Keyes' body camera footage briefly shows Al-Amin at the driver's side of his car, but the dashboard and Officer Keyes' movements prevents a viewer from seeing if Al-Amin made any arm movements.[2] (Def. Ex. 1 at 1:19). Officer Keyes parked his car, drew his gun, and ordered Al-Amin to the ground. (Tr. 39). Al Amin complied with the commands and laid on the ground, and Officer Keyes handcuffed him. (Tr. 39). Officer Gillies and Al-Amin had a brief exchange about Al-Amin punching Rachelle's car window as he was being handcuffed.[3] (Gov't Ex. 1 at 01:12–01:27). Officer Keyes and Officer Gillies arrested Al-Amin for violation of the no-contact order and placed him in the back of Officer Gillies' squad car. (Tr. 15, 17).

After Al-Amin was secured, Officer Gillies inspected Al-Amin's car "to see if he had dumped something in the vehicle." (Tr. 31). Officer Gillies also testified he suspected Al Amin might have a gun because "he kept moving around really quickly . . . like [he was]

---

[2] The body camera footage referred to is almost exclusively from Officer Keyes' body camera. (Def. Ex. 1). Officer Gillies also had a body camera, (Gov't. Ex. 1), but the Court only refers to this footage when discussing the brief exchange between Officer Gillies and Al-Amin while Al-Amin is being handcuffed.

[3] The entirety of this exchange is quoted in the Court's analysis of whether Officer Gillies' statements constituted a custodial interrogation under the Fifth Amendment.

in a panic mode." (Tr. 16). Officer Keyes spoke with Rachelle about the incident and Rachelle told him that Al-Amin threatened to shoot her tires out with a gun. (Def. Ex 1). Rachelle told Officer Keyes this between 3:25 and 3:36 on Officer Keyes's body camera video. (Def. Ex. 1).[4] At 3:39, the body camera shows Officer Gillies searching Al-Amin's car, but the footage does not establish when the search started. (Def. Ex. 1). Between 3:40 and 3:41, Officer Keyes tells Officer Gillies that Rachelle stated Al-Amin had a gun somewhere. (Def. Ex. 1). Between 3:48 and 3:49, Officer Gillies' tells Officer Keyes "I found it," referring to Al-Amin's gun. (Def. Ex. 1). Officer Gillies testified he began searching Al-Amin's car before Rachelle's information was relayed to him, but shortly after beginning the search, found a loaded revolver in the glove box. (Tr. 33–34). Officer Gillies testified that he did not perform an inventory search of the vehicle. (Tr. 34).

On August 7, 2018, Sergeant Jerod Silva interrogated Al-Amin while he was in custody. (*See* Gov't Ex. 2). Sergeant Silva interrogated Al-Amin for 78 minutes before *Mirandizing* him. (Gov't Ex. 2, at 4:34). After Al-Amin was *Mirandized*, the interrogation continued.

## II.     DISCUSSION

### A.     Motion to Suppress Evidence

Al-Amin argues the search of his car was unlawful because there was no exception to the warrant requirement. Specifically, Al-Amin states the search was not a search

---

[4] For clarity, the Court references the time stamps on Officer Keyes' body camera footage in this portion.

incident to arrest, the automobile exception does not apply, and there would not have been inevitable discovery of the gun. The Government argues the opposite.

### 1. Automobile Exception

The Fourth Amendment protects an individual's right to be free from unreasonable searches and seizures. U.S. Const. Amend. IV. Searches conducted without a warrant are per se unreasonable, subject to a few well-established exceptions. *United States v. Hill,* 386 F.3d 855, 858 (8th Cir. 2004). Under the automobile exception, officers may search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity. *Id.* Probable cause exists "where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kennedy,* 427 F.3d 1136, 1141 (8th Cir. 2005). In determining whether an officer had probable cause to search, courts apply a common sense approach and consider all relevant circumstances. *United States v. Gleich*, 397 F.3d 608, 612 (8th Cir. 2005). Thus in the present case, the Court considers whether the officers, under the totality of the circumstances, had probable cause to believe Al-Amin's vehicle contained evidence of criminal activity.

Al-Amin argues the circumstances here are like those in *United States v. Spinner*, where the Court found no probable cause for officers to search a car. 475 F.3d 356 (D.C. Cir. 2007). In *Spinner*, the police approached the defendant to tell him his truck was illegally parked. *Id.* at 357. As the officers approached, the defendant dipped towards the center of his vehicle as if he was trying to hide something. *Id.* Because the defendant seemed nervous, officers frisked him and found nothing. *Id.* at 359. Then, over the

defendant's objection, officers searched his truck and found a gun. *Id.* The Government argued there was probable cause to search the vehicle. *Id.* The Court disagreed and found that while the officers may have thought the defendant was hiding something, "they had no reason whatsoever to believe it was a weapon. Therefore, when he denied them further consent to search his vehicle, the encounter should have ended." *Id.* at 360.

In the present case, unlike *Spinner*, Al-Amin gave the officers reason to believe he may be hiding contraband. Al-Amin's car was not searched merely because he seemed nervous, as was the case in *Spinner*. The officers responded to a 911 call from a caller reporting a violation of a no-contact order. (Tr. 7–8). Officer Gillies arrived on the scene to see Al-Amin screaming at his wife and punching her car window, and then saw Al-Amin walk back to his car and get into the passenger side of his car. (Tr. 10–11). At this point, Gillies ordered Al-Amin out of his car and Al-Amin refused to comply with the order. (Tr. 12). Officer Gillies testified that he next saw Al-Amin make furtive arm movements on the passenger side of the car for approximately thirty seconds. (Tr. 13, 25, 27). These facts, in their totality, gave rise to probable cause; the circumstances established a fair probability that Al-Amin may have hidden contraband in the car.

The Court does not consider Rachelle's information on Al-Amin's threat to shoot her tires in the probable cause analysis because it is unclear whether Rachelle's information came before the search of Al-Amin's car began. The body camera shows that Rachelle told Officer Keyes about Al-Amin's threat to shoot her tires between 3:25 and 3:26. (Def. Ex. 1). Seconds later, at 3:39, the video shows Officer Gillies searching Al-Amin's car when Officer Keyes talks to Officer Gillies about Rachelle's allegations. (Def. Ex. 1). The

Government argues Officer Keyes heard Rachelle's information at the exact moment the search began. *See United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005) (applying collective knowledge doctrine to uphold seizure of ammunition by officer with no personal knowledge that defendant was subject to protective order restricting him from possessing ammunition). Al-Amin argues Rachelle's information came after the allegedly illegal search began. The Court cannot determine whether Rachelle's information came before, after, or at the exact moment Officer Gillies began searching Al-Amin's car because the video footage does not show when Officer Gillies began searching Al-Amin's car in relation to Officer Keyes hearing Rachelle's information. The Court also finds it unnecessary to resolve this factual conflict because probable cause was established after Al-Amin made furtive movements in the passenger side of the car—well before Rachelle's information was relayed to Officer Keyes and then Officer Gillies.

### a.  Al-Amin's Furtive Arm Movements

Al-Amin claims the officers' testimony on Al-Amin's furtive arm movements should be discredited because of conflicting testimony. He argues that without the alleged furtive arm movements, probable cause would not have been established. Al-Amin also argues he could not have made furtive arm movements for more than a second, if at all. Al-Amin claims Officer Gillies could not have taken more than three or four seconds to stop his squad car, and that is the period Officer Gillies supposedly saw Al-Amin making these furtive arm movements.

The Court agrees that the officers' testimony of Al-Amin making furtive arm movements in his car helped establish probable cause for the officers to search his car.

There are two instances of furtive arm movements the officers testified to: first on the passenger side of the car and then on the driver's side of the car. The Court addresses each instance in turn.

The Court credits Officer Gillies' testimony on what happened while Al-Amin was in the passenger side of his car. Specifically, Officer Gillies testified Al-Amin made furtive arm movements while in the passenger side of the car for about thirty seconds. (Tr. 13, 25, 27). Al-Amin argues Officer Gillies could not have spent more than 3 or 4 seconds parking his squad car when he saw the arm movements happening. But Al-Amin offers no evidence for his arguments. For instance, Al-Amin does not point to conflicting testimony by Officer Keyes on what happened on the driver's side or offer any testimony himself offering a different account of what happened. The Court thus relies on Officer Gillies' uncontradicted testimony on the record.

The Court acknowledges the officers' testimony is conflicting on whether Al-Amin made furtive arm movements while on the driver's side of his car: Officer Gillies stated it did not look like Al-Amin was trying to hide anything (Tr. 29), while Officer Keyes stated it looked like Al-Amin was trying to hide something (Tr. 45). The Court does not find either officer's testimony credible on what happened while Al-Amin was in the driver's side because of the conflicting testimony.

In sum, the Court finds there was probable cause to search Al-Amin's car. The Court does not find *Spinner* analogous to these circumstances. Al-Amin's furtive arm movements in the passenger side of his car while defying police orders to exit his car, after being

verbally and physically aggressive towards his wife, established probable cause for the officers to search the car.

### 2.    Search Incident to Arrest

Under the search incident to arrest exception to the warrant requirement of the Fourth Amendment, officers may search a vehicle incident to an arrest only if (1) the arrestee is unrestrained and "within reaching distance of the passenger compartment" when the search begins or (2) "it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 351 (2009).

The first condition is not present here. The parties do not dispute that Al-Amin was handcuffed and in the back of a squad car when the search began. (*See* Tr. 31). Thus, the search of the car was unnecessary to ensure officer safety.

At issue then is the second condition for a search incident to arrest. Al-Amin was arrested for violating a no-contact order against his estranged wife. (Tr. 8–9). The Government argues it was objectively reasonable for Officer Gillies to believe: (1) that a person willing to violate a no-contact order in order to assault his wife would possess a weapon of some kind while doing so; and (2) that upon seeing the police arrive, the person would attempt to hide the weapon."   (ECF No. 42, at 12). While it was objectively reasonable for Officer Gillies to believe this, the Fourth Amendment only allows searches incident to arrest if "it is reasonable to believe the vehicle *contains evidence of the offense of arrest*." *Arizona*, 556 U.S. at 351 (emphasis added). Al-Amin was arrested for violating a no-contact order against his estranged wife. (Tr. 15, 17). A no-contact order prohibits a person from being in physical or verbal contact with another person. *See* MINN. STAT.

609.748 (2018). As such, a violation of a no-contact order requires evidence of the prohibited party being in physical or verbal contact with the protected party. Here, there is ample evidence Al-Amin broke his no-contact order: he followed Rachelle in his car, he physically approached Rachelle's vehicle and verbally shouted at her, and he physically hit Rachelle's car windows with his fists. (Tr. 10–11). Al-Amin's physical and verbal contact with Rachelle is evidence of his crime, but Al-Amin's gun is not evidence of his verbally or physically violating a no-contact order. The Court accordingly finds the Government could not lawfully search Al-Amin's car pursuant to a search incident to arrest for the violation of a no-contact order.

### 3.    Inevitable Discovery Exception

The parties disagree on whether the gun would inevitably have been found in an inventory search. The Government argues an inventory search would have been performed and the gun would inevitably have been found. Al-Amin argues his car would not have been towed because Minneapolis Police policy allows officers to tow a car if there is probable cause to believe the car contains evidence of a crime. In light of Minneapolis Police policy giving officers discretion on towing, the Court has insufficient information to determine whether an inventory search would have happened and thus does not address this issue.[5]

---

[5] Minneapolis Police Department Policy states that "[u]nless otherwise prohibited by law, officers *may* impound vehicles parked on public property" for a number of different reasons. MINNEAPOLIS POLICE DEPT., *Minneapolis Police Policy & Procedure Manual,* Article 7-701A.III.B, http://www.ci.minneapolis.mn.us/police/policy/mpdpolicy_7-700_7-700 (last updated Sept. 14, 2018) (emphasis added).

### B.    Motion to Suppress Statements

Al-Amin argues his statements to law enforcement officer should be suppressed. Al-Amin argues his on-scene statements as he was handcuffed by Officer Gillies should be suppressed because the circumstances were equivalent to a custodial interrogation and he was not *Mirandized*. Al-Amin argues his statements to Sergeant Silva should be suppressed because Sergeant Silva did not *Mirandize* Al-Amin until 78 minutes into the interview.

### 1.    On-Scene Statements

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. Amend. V. The Supreme Court adopted measures to ensure that a suspect is advised of his Fifth Amendment rights before custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." *Id.* at 444.

The on-scene statements refer to the exchange between Al-Amin and Officer Gillies after Al-Amin was handcuffed by Officer Keyes.

> Al-Amin: I'm just trying to talk to you, man [appears to be referring to his wife]
> Officer Gillies: You just punched her window as I was pulling up.
> Al-Amin: Yeah, that's because that's my wife.
> Officer Gillies: So that's okay for you to do that?
> Al-Amin: I didn't punch her.
> Officer Gillies: You punched her window.
> Al-Amin: That's my wife. She done destroyed all my cars and all type of shit. Come on, man.

(Gov't Ex. 1 at 01:12–27).[6] Al-Amin argues this was a custodial interrogation, because while Officer Gillies' responses to Al-Amin were phrased as statements, implicit in the responses was the question, "why?" Al-Amin argues he then tried to explain himself, thereby incriminating himself. In contrast, the Government argues that a police officer's verbal reactions to a suspect's spontaneous statements are not a custodial interrogation, nor its functional equivalent, regardless of whether a suspect is *Mirandized*.

The Court finds the on-scene statements were the functional equivalent of a custodial interrogation. Al-Amin was handcuffed and seated on the ground with Officers Gillies and Keyes standing over him. Thus, Al-Amin was deprived of his freedom of action in a significant way. He was not told he was free to leave or to abstain from answering questions. *See e.g.*, *United States v. Cowan*, 674 F.3d 947, 957–58 (8th Cir. 2012) (finding the defendant was in custody for purposes of *Miranda* in part because he was detained, handcuffed, patted down, and no one told defendant he was free to leave or to abstain from answering questions). While Al-Amin gave a spontaneous statement during the process insofar as he was yelling at Rachelle—"I'm just trying to talk to you, man"—the incriminating statements the Government seeks to introduce happened in response to Officer Gillies' several statements to Al-Amin. The Court agrees with Al-Amin that even though Officer Gillies may have made statements to Al-Amin rather than questions, they nonetheless elicited a response in the form of an explanation by Al-Amin. For instance,

---

[6] Al-Amin made several statements at the scene that were captured by the various recording devices involved, but the above statements involve law enforcement interaction and are the only statements at issue in the motion before the Court.

Officer Gillies asked Al-Amin "So, that's okay for you to do that?" in reference to Al-Amin punching Rachelle's window. (Gov't Ex. 1 at 01:12–27). This type of verbal communication, whether categorized as a statement or a question by the Government, is intended to illicit an incriminating response by Al-Amin. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) ("[C]ustodial interrogation for purposes of Miranda includes both express questioning and words or actions that . . . *[have] the force of a question on the accused* . . . ." (internal citation and quotation marks omitted) (emphasis added)). Indeed, this conclusion is buttressed when reading together everything said by Officer Gillies to an agitated Al-Amin in the span of about 15 seconds: "You just punched her window as I was pulling up. . . . So, that's okay for you to do that? . . . You punched her window." Therefore, the Court recommends that Al-Amin's responses during this exchange be suppressed because the circumstances were the functional equivalent of a custodial interrogation.

### 2.    Interview with Sergeant Silva

The Government agrees to refrain from using Al-Amin's pre-Miranda statements to Sergeant Silva during the in-custody interview. At issue then, are the statements to Sergeant Silva after Al-Amin is Mirandized. Al-Amin argues these statements should be suppressed because Sergeant Silva's Miranda warning came midstream during the interrogation with no break to attenuate the illegality of the statements before the warning.

Miranda warnings "given mid-interrogation, after the defendant g[ives] an unwarned confession, [a]re ineffective, and thus a confession repeated after warnings [a]re given [are] inadmissible at trial." *United States v. Aguilar*, 384 F.3d 520, 523 (8th Cir.

2004). "Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *United States v. Villalba–Alvarado*, 345 F.3d 1007, 1010 (8th Cir. 2003).

The Court finds that the forbidden two-stage interrogation is not present here. Al-Amin did not confess in the pre-*Miranda* portion of the interview. Rather, Al-Amin spoke about his romantic relationships and tried to negotiate cooperation with Sergeant Silva but did not confess to the crimes he was charged with. (*See* Gov't Ex. 2). Because Al-Amin did not confess in the pre-*Miranda* portion, that information could not be used to elicit a second confession in post-*Miranda* portion of his interview.

Whether Al-Amin's post-*Miranda* statements are admissible then turns on whether they were made knowingly and voluntarily. "To determine if a confession is voluntary . . . Court[s] will look at the totality of the circumstances, examining the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his will easily to be overborne." *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987). Coercive police activity is a necessary predicate to the finding that a statement was made involuntarily. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "In considering whether a [statement] was voluntary, the determinative question is whether the [statement] was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." *U.S. v. Pierce*, 152 F.3d 808, 812 (8th Cir. 1998) (citing Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988)). "In making this determination, courts look at the totality of

14

the circumstances, including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." *Id.* (citing *United States v. Meirovitz*, 918 F.2d 1376, 1379 (8th Cir. 1990), *cert. denied*, 502 U.S. 829 (1991)).

The Court finds that the tactics used by Sergeant Silva during his interview of Al-Amin were not improperly coercive, whether the Court looks at the pre- or post-*Miranda* questioning. The video recording does not show Sergeant Silva touching, yelling at, or threatening Al-Amin in any way. The tone of the interview was conversational. Al-Amin never requested an attorney or refused to answer any questions. Al-Amin did not appear intoxicated and gave appropriate responses to the questions asked of him. In fact, when Al-Amin was *Mirandized*, he commented "So this is where the official interview starts." (Gov't Ex. 2 at 4:32). The Court finds this statement shows that Al-Amin was aware this secondary portion of the interview could be used against him. In sum, in considering the totality of the circumstances of Al-Amin's interrogation, there is no evidence of coercion and the Court does not find that Al-Amin's will was overborne to the extent that his capacity for self-determination was impaired. To the contrary, the circumstances surrounding Al-Amin's interview indicate he gave his post-*Miranda* statements to Sergeant Silva voluntarily. Accordingly, Al-Amin's motion to suppress his interview should be denied as to his post-*Miranda* statements.

## III.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant Syed Ben Al-Amin's Motion to Suppress Statements, Admissions, and Answers (ECF No. 19) be **DENIED**.

2.  Al Amin's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 20) be **DENIED**.

Dated: February 13, 2019

_s/Steven E. Rau_
STEVEN E. RAU
United States Magistrate Judge

## Notice

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).