UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

            Plaintiff,

v.

Syed Ben Al-Amin,

            Defendant.

**MEMORANDUM OPINION
AND ORDER**
Criminal No. 18-265 ADM/SER

_____

Jeffrey S. Paulsen, Assistant United States Attorney, United States Attorney's Office, Minneapolis, MN, on behalf of Plaintiff.

Robert D. Richman, Esq., RD Richman Law, St. Louis Park, MN, on behalf of Defendant.
_____

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for consideration of Defendant Syed Ben Al-Amin's ("Al-Amin") Objection [Docket No. 46] to Magistrate Judge Steven E. Rau's February 13, 2019 Report and Recommendation ("R&R") [Docket No. 45]. In the R&R, Judge Rau recommends denying Al-Amin's Motion to Suppress Statements, Admissions, and Answers ("Motion to Suppress Statements") [Docket No. 19], and denying Al-Amin's Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Motion to Suppress Evidence") [Docket No. 20]. Also before the Court for consideration is the Government's Objection [Docket No. 48] to the R&R's definition of search incident to arrest. After a de novo review of the record, and for the reasons stated below, Al-Amin's Objection is sustained in part and denied in part. The Government's Objection is also sustained in part and denied in part. Al-Amin's Motions are denied for the reasons stated below.

## II. BACKGROUND

**A. Approach and Arrest**

On August 6, 2018, at about 1:24 p.m., Minneapolis Police Officer Paul Gillies ("Officer Gillies") was dispatched to respond to a 911 call alleging a violation of a restraining order. December 20, 2018 Corrected Motions Hearing Transcript ("Tr." and "Suppression Hearing") [Docket No. 38] at 7. Officer Gillies was informed that a female caller had reported "her husband was following her in a car and that they had pulled over in the area of 12th and Fremont," id. at 8, a location in North Minneapolis.

As Officer Gillies approached 12th and Fremont, he saw two cars parked, one "right behind" the other. Id. at 10. Al-Amin was standing outside the lead car's driver side window and was "yelling and screaming" at the occupant. Id. Officer Gillies witnessed Al-Amin punch the window. The driver of the car, later identified as Al-Amin's wife, responded by pulling her car forward, "probably 30 feet or so." Id. at 11. Al-Amin walked back to the unoccupied second car[1] and climbed into the front passenger seat. Id. at 12.

At this point, Officer Gillies' body camera recording is available to compare with his testimony. Gov't Ex. 1, at 18:27:26. The body camera shows Al-Amin in the passenger seat with the passenger side door still open. Id. at 18:27:28-33. Officer Gillies testified that he could see Al-Amin moving his arms inside the car and "frantically doing something" as Officer Gillies

---

[1] Al-Amin stated during later interrogation that he was borrowing this vehicle. Later discovery showed that the vehicle is not registered to Al-Amin. Nonetheless, it is reasonable to believe that from the officer's perspective at the time, this was Al-Amin's vehicle. Neither party argues the level of privacy Al-Amin could expect in the borrowed vehicle. For ease of description, the car will be referred to as Al-Amin's here.

2

pulled up in the squad car. Tr. at 13. The bodycam footage shows Officer Gillies stop his vehicle, open the door, and point his firearm at Al-Amin. Gov't Ex. 1 at 18:27:26-32. There is no audio for this portion of the video. Within three or four seconds of when Officer Gillies opens his door Al-Amin exits his vehicle with his raised hands empty, shutting the passenger door once he is out. Id. at 18:27:32-36. Al-Amin then can be seen to turn and walk around to the driver side while still holding his hands raised. Id. at 18:27:37-49. Then Al-Amin leans over and opens the driver side door.[2] Id. at 18:27:50. Officer Gillies taps his body camera and the audio turns on. Id. at 18:27:56. Officer Gillies repeatedly yells for Al-Amin to "get on the ground." Id. at 18:27:57-28:14. Al-Amin seems to reconsider getting into the driver side,

---

[2] At the Suppression Hearing, the Government asked Officer Gillies about the sequence of events. Officer Gillies recalled that he "pulled up, got out of my squad car with my gun, started giving him [Al-Amin] orders. [Al-Amin] climbed into the passenger's side of the car, shut the door. And then he started to like go through –" Tr. at 13.

> Q. You said instead of complying he got into the passenger's side of that car?
> A. Yes, he did.
> Q. And what happened then?
> A. Once he was inside the car, he started, like, going through his pockets, trying to, like, look like he was trying to hide something. It was either, like, in the glove box, or he was just -- he was just in that passenger's side. He was like frantically doing something.
> Q. And how long did that last?
> A. I'm not quite sure. It could have been like 30 seconds. It was pretty quick.
> Q. And were you giving him orders the whole time?
> A. Yes, I was.
> Q. And he wasn't complying?

This testimony contradicts the bodycam footage showing that Officer Gillies did not open his squad car door, draw his gun, and give orders that would have been audible to Al-Amin until after Al-Amin was already in the passenger seat of his car. Gov't Ex. 1. The bodycam footage also shows that Al-Amin's passenger side door was open. Because of these discrepancies, the Court is only crediting uncontested testimony of Officer Gillies. The Court relies, for all other facts, on the bodycam footage and audio of the two officers. Gov't Ex. 1 and Def. Ex. 1.

3

pushes the door shut and walks away from the vehicle to the center of the road where he lays down. Id. at 18:28:05-14.

At this point, Minneapolis Police Officer Ryan Keyes' ("Officer Keyes") body camera shows that as he pulled up his squad car, Al-Amin walks away from his car and lays down. Def. Ex. 1 at 18:28:10-14. The officers then approach and Officer Keyes handcuffs Al-Amin. Id. at 18:28:26-35; Tr. at 48. Officer Gillies has a brief exchange with Al-Amin about Al-Amin punching the window of the first parked car. Def. Ex. 1 at 18:28:38. The officers arrest Al-Amin for violation of a no contact order and place him in the back of Officer Gillies' squad car. Def. Ex. 1; Tr. at 15, 17.

**B. Search**

After Al-Amin is secured in the squad car, Officer Gillies turns to his fellow officers and states, "He punched her window as I turned the car," and, "he tried to lock up the vehicle, and weird shit, dumping stuff out of his pockets." Def. Ex. 1 at 18:29:33-42. Officer Gillies then approaches Al-Amin's wife, who is on the sidewalk after having walked from her vehicle back toward the scene. Gov't Ex. 1 at 18:29:49-53. Officer Gillies asks her if she "actually" has a restraining order. Id. at 18:29:50-53. The audio does not pick up her response, but Officer Gillies says, "oh, you both have one [, a restraining order]?" Id. at 18:29:55-57. Officer Gillies then walks toward Al-Amin's vehicle and states, "I just wanna see what he was dumping." Id. at 18:30:05-07. Officer Gillies opens the defendant's car door and rummages around, first on the floor of the passenger compartment, then looking into the center console, and finally popping open the glove box. Id. at 18:30:12-40, 18:30:34 (when Officer Gillies touched the glove compartment). As Officer Gillies walks over to Al-Amin's car, Officer Keyes is told by Al-

4

Amin's wife, that Al-Amin threatened to shoot out her car's tires and had a gun in his car. Def. Ex. 1 at 18:30:14. Officer Keyes asked, "where?" Id. at 18:30:17 Al-Amin's wife can be heard saying, "I don't know," but then she repeats the gun threat allegation. Id. at 18:30:17-29. Officer Keyes walks over closer to Al-Amin's vehicle and tells Officer Gillies, "...she says he's got a gun somewhere in the car, just so you know." Id. at 18:30:29-32. Two to three seconds later, Officer Gillies can be heard saying, "found it. " Id. at 18:30:39.

**C. Interrogation**

On August 7, 2018, Sergeant Jerod Silva ("Sergeant Silva") interrogated Al-Amin while he was in custody. Gov't Ex. 2. The Government agrees to refrain from using Al-Amin's pre-Miranda statements to Sergeant Silva. But, Al-Amin also objects to the possible use of his post-Miranda warning statements, arguing that the pre-Miranda statements and the officer's actions surrounding them taints the post-statements. Therefore, the conduct of the interview will be considered.

The videotaped interview shows Sergeant Silva enters the interview room at approximately 3:16:00. Gov't Ex. 2. Before Sergeant Silva is finished introducing himself and before he asks a single question, Al-Amin interrupts (3:16:52) Sergeant Silva and talks at him for seven minutes (3:23:54), whereupon, Sergeant Silva excuses himself for 15 minutes (until 3:38:52). Id. After the break, Sergeant Silva reenters the room and again Al-Amin talks at Sergeant Silva for almost an hour without questions (until approximately 4:32:00). At this point, Sergeant Silva interrupts Al-Amin to read him his Miranda warning. Al-Amin states, "So, this is where the official interview starts." Id. at 4:32:46. Sergeant Silva asks for Al-Amin's full name and spelling, birth date, and other biographical data and then as he is about to be read his rights,

5

Al-Amin interrupts Sergeant Silva again to tell him why he does not have a phone. Sergeant Silva reads the Miranda warning at 4:34:19. Al-Amin acknowledges the warning with a verbal "yes," indicating that he understands. After Al-Amin is Mirandized, the interrogation continues.

### III.  DISCUSSION

#### A.  Standard of Review

In reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); see also D. Minn. L.R. 72.2(b). A district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id.

#### B.  Objections

##### 1.  Motion to Suppress Evidence

Al-Amin objects to the R&R's denial of his motion to suppress and the finding that probable cause supported Officer Gillies' search of Al-Amin's vehicle. The Government supports the R&R's conclusion, but objects to the R&R's rejection of the Government's "search incident to arrest" rationale for Officer Gillies' search of Al-Amin's vehicle.

The Fourth Amendment protects an individual's right to be free from unreasonable searches and seizures. U.S. Const. Amend. IV. Searches without a warrant are per se unreasonable, subject to a few well-established exceptions which include an automobile exception. United States v. Hill, 386 F.3d 855, 858 (8th Cir. 2004). The automobile exception authorizes officers to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity. Id. (citing United States v. Wells, 347 F.3d

280, 287 (8th Cir. 2003)). "If there is probable cause to believe a vehicle contains evidence of criminal activity, United States v. Ross, 456 U.S. 798, 820-821 (1982), authorizes a search of any area of the vehicle in which the evidence might be found." Arizona v. Gant, 556 U.S. 332, 347 (2009). But, the Court in Gant explained, "to allow vehicle searches incident to any arrest would serve no purpose except to provide a police entitlement, and it is anathema to the Fourth Amendment to permit a warrantless search on that basis." Id. So, the Supreme Court established a narrower rule when probable cause is not established: "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Id. at 351.

The government bears the burden of establishing that an exception to the warrant requirement applies. Hill, 386 F.3d at 858.

Before analyzing the constitutionality of Officer Gillies' search of the glove compartment of Al-Amin's vehicle, it is necessary to address the inconsistencies between Officer Gillies suppression hearing testimony and what is seen and heard on Officer Gillies' body camera and then on Officer Keyes' body camera. Compare Tr. at 7-37, with Gov't Ex. 1, and Def. Ex. 1; see also United States v. $45,000.00 in United States Currency, 749 F.3d 709, 714 (8th Cir. 2014) (expressing concerns with crediting inconsistent testimony). Officer Gillies' testimony by his recollection at the Suppression Hearing conflicts with the objective visual and audio evidence produced by the officers' body cameras. Officer Gillies testified that after he observed Al-Amin punch the window of his wife's car, Al-Amin's wife drove forward about 30 feet, and then Al-Amin "walk[ed]" to his vehicle. Tr. at 12. Officer Gillies then testified,

> I pulled up, got out of my squad car with my gun, started giving him orders. He climbed into the passenger's side of the car, [and] shut the door.

Tr. at 12. Officer Gillies then testified that once Al-Amin was inside the car, with the door closed, Officer Gillies could see Al-Amin going through his pockets like he was trying to hide something. This testimony is problematic. The video, without audio, does not show Al-Amin walking back to his car. The video does show that when Officer Gillies pulls up, opens his door, and gets out of his car with his gun drawn, Al-Amin is already in the passenger seat of his car and the passenger side door is open. Al-Amin takes at most four seconds to show his empty hands and get out of the car. This testimony casts doubt on the credibility of Officer Gillies' testimony as to the nature and amount of movement he could see from Al-Amin. Because of the discrepancies, the Court will not credit the Suppression Hearing testimony of Officer Gillies with regard to Al-Amin's "furtive arm movements," but will rely instead on the evidence provided by the officer's body cameras instead. Thus the credibility assessment of the R&R cannot be the rationale for a finding of probable cause to search.

### a. Automobile Exception

Probable cause is established for a warrantless search of a vehicle "where, in the totality of circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005); United States v. Grooms, 602 F. 3d 939, 942 (8th Cir. 2010). The automobile exception focuses on what law enforcement officers knew "at the time of the search" of the vehicle. Id. at 1140-41; United States v. Barron-Celis, No. 0:16-cr-00319-ADM-KMM, 2017 U.S. Dist. LEXIS 73083, at *12 (D. Minn. Apr. 4, 2017).

The totality of circumstances here consists of officers summoned to a roadside scene

based on a report of a violation of a no contact order by a suspect in a following vehicle. Officer Gillies saw Al-Amin standing and yelling through the closed window of the victim's car and then saw Al-Amin strike the window with his fist. The victim responded by driving her car forward about 30 feet while Al-Amin walked back to his vehicle. There is no testimony that Al-Amin saw Officer Gillies' squad car and there is nothing in the record to suggest that Al-Amin was trying to get back to his vehicle in response to police arrival. Officer Gillies also testified that he could see what Al-Amin was wearing, a track suit with the jacket unzipped, exposing a bare chest. Officer Gillies did not testify that he saw or thought Al-Amin possessed a weapon on his person as he stood at the victim's window. The bodycam footage then shows Al-Amin was seated in the passenger side of his vehicle with the door still open when Officer Gillies pulled up. Within seconds of Officer Gillies opening his door Al-Amin gets out of his car, and Al-Amin can be seen exiting the passenger side with his raised hands empty. Al-Amin was not fully compliant. Al-Amin did not follow Officer Gillies' instruction to get on the ground until after he walked around to the driver side of the vehicle. He appears to consider getting in, and then, as the second squad car pulls up, walks away from the vehicle and lays down. Al-Amin was handcuffed without incident. Officer Keyes patted him down. No contraband was found. Al-Amin was placed in the back of the squad car.

    Officer Gillies then walks over to talk to the suspected victim. He asks her if it was true that she had a no contact order against Al-Amin. Officer Gillies then learns that Al-Amin and his wife had mutual no contact orders. Officer Gillies then allows Officer Keyes to take over the questioning of the victim and approaches the passenger side compartment of Al-Amin's vehicle. Based on the totality of these circumstances, as Officer Gillies began searching Al-Amin's

vehicle, he did not yet have probable cause to search the vehicle. All the information the officers had of a crime was related to the suspected violation of a no contact order and Al-Amin's confrontation with his wife at her car. See, e.g., United States v. Hogan, 25 F.3d 690, 693 (8th Cir. 1994) ("At most, the agents had a hunch" that drugs would be in the vehicle they searched). Officer Gillies, after he found out that Al-Amin and his wife had restraining orders against each other, walked toward Al-Amin's car, and the bodycam records Officer Gillies stating, "I just wanna see what he was dumping." The subjective state of mind of the officer does not "invalidate" a search where probable cause has been established, Devenpeck v. Alford, 543 U.S. 146, 153 (2004), but his statement does not lend credence to the argument that an otherwise reasonable officer in similar circumstances would have foregone a search warrant because he made a probable cause determination.

The Government has not shown under the probable cause requirement, the "fair probability that contraband or evidence of a crime will be found in a particular place," i.e. the vehicle. Officer Gillies was no doubt curious about why Al-Amin had returned to the passenger side of the vehicle instead of the driver side and why Al-Amin was so interested in locking the vehicle up before he was arrested. But neither of these of these facts significantly suggests probable cause for a search. If Arizona v. Gant is to mean anything in preventing a general police entitlement to search a vehicle, then the Court cannot justify a probable cause search of the passenger compartment based on the objective evidence in this record.[3]

---

[3] Even if the Court credited the portion of Officer Gillies' testimony on "furtive movements," probable cause cannot be premised on the furtive movements alone. See, e.g., United States v. Spinner, 475 F.3d 356, 359-60 (D.C. Cir. 2007) (where police had conducted a Terry stop, the defendant was out of his car, and the pat down found no contraband on his person, earlier observed "furtive movements" did not give the police probable cause to search

### b. Search Incident to Arrest

In contrast to the automobile exception, the search incident to arrest analysis starts with whether there was probable cause to arrest the defendant and then continues on to the analysis as to whether the officer had a reasonable belief that the vehicle associated with the defendant contains evidence of the offense of arrest. Gant, 556 U.S., at 342 (citing Thornton v. United States, 541 U.S. 615, 632 (Scalia, J., concurring in judgment) ("reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.")). There is no dispute in this case that Al-Amin was arrested based on probable cause that he was in violation of a no contact order. Furthermore, there is no dispute that when the officers began their search, Al-Amin was secured in custody in the back of a police squad car, far from the passenger side of his vehicle. But, "[e]ven after an arrestee has been secured in the back of a police car, officers may search the vehicle incident to an arrest if their observations provide a reasonable basis to conclude that evidence of the crime of arrest might be found in the vehicle." United States v. Allen, 713 F.3d 382, 387 (8th Cir. 2013) (cleaned up) (citing United States v. Tinsley, 365 F. App'x 709, 711 (8th Cir. 2010) (per curiam)).

The Supreme Court has not provided much guidance as to what is meant by "reasonable to believe." Most courts agree that "reasonable to believe" is a less demanding standard than probable cause. United States v. Edwards, 769 F.3d 509, 514 (7th Cir. 2014) (agreeing with the 9th and D.C. Circuits, and noting "the Court's choice of phrasing suggests...a less demanding standard); see also Thomas v. Plummer, 489 Fed. Appx. 116, 121-22 (6th Cir. 2012) (discussing

---

the vehicle prior to arrest); similarly, United States v. Aquino, 674 F.3d 918, 925 (8th Cir. 2012), and United States v. Kroll, 351 F. Supp. 148 (W.D. Mo. 1972) aff'd, 481 F.2d 884 (8th Cir. 1973) (discussing probable cause in relation to the "inherent unreliability of furtive gestures").

11

and then declining to choose a "rubric"). The Eighth Circuit case law has not explicitly decided, but its opinions suggest agreement with the majority of courts that have discussed the issue. Allen, 713 F.3d at 387 (reasonable to believe the vehicle contained evidence relevant to the crime of conspiracy to possess counterfeit securities); Tinsley, 365 F. App'x at 711 (reasonable to believe the vehicle contained evidence relevant to his arrest for intoxication); United States v. Stegall, 850 F.3d 981 (8th Cir. 2017) (reasonable to believe defendant's vehicle might contain evidence of "terroristic threatening"); United States v. Casteel, 717 F.3d 635 (8th Cir. 2013) (where probable cause for arrest on firearm offenses justified search within vehicle of coin box and bank bag because "ammunition and paperwork related to the firearms investigation" might be found in the vehicle).

There is no dispute that the crime of arrest was violation of a no contact order, Minn. Stat. § 609.748 (2018), which requires evidence of the prohibited party being in physical or verbal contact with the protected party. The question then is whether it was reasonable to believe that Al-Amin's car might contain evidence relevant to committing the crime of violating a no contact order. The officers could reasonably believe that Al-Amin had returned to his vehicle to hide evidence of his violation, or that the vehicle contained evidence of his stalking his wife. The prosecution argues the officers could have been searching for Al-Amin's phone, or other maps or documentation which would tend to prove his intent to violate the no contact order by deliberately approaching his wife, as opposed to having some accidental, unplanned encounter with her on the street as he claimed in his post-arrest statement. The 911 call report suggested that Al-Amin was using his car to follow his wife, which lends credence to the likelihood that evidence of the violation of the no contact order might be in the car. After Al-

Amin was secured in the squad car, the officers learned from his wife, the victim, that he had threatened to shoot her tires with a gun. This bolstered the need to search his car. The gun would be a very significant piece of evidence in a violation of a no contact order case between volatile, disgruntled partners to a marriage.

### c. Inevitable Discovery

Finally, even if the officers could not search the vehicle incident to arrest at the time that they began searching, the firearm found in the glove compartment may still be admissible if the Government can show it would have been inevitably discovered. Allen, 713 F.3d at 387. "If the Government can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . [then] the evidence should be received." Id. (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). "For that exception to apply the government must show (1) a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) an active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation." Id. (citing United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997)).

In this case, Officer Keyes interviewed the victim of the violation of the no contact order. She stated that Al-Amin had a gun in his vehicle and, while he was shouting at her through her window, he threatened to shoot out her tires. Officer Gillies was reasonably pursuing evidence incident to Al-Amin's arrest when he learned from Officer Keyes that there may be a firearm in the car. Officer Gilles opened the glove compartment and found the gun. But, even if he began the search unreasonably, Al-Amin's wife ultimately gave the officers a reasonable belief that would support a search incident to arrest after the officers became aware of the firearm threat.

13

## 2. Motion to Suppress Statements

Al-Amin also objects to the R&R's recommendation that the portion of his statement after he was Mirandized was constitutionally valid. Al-Amin contends that his entire statement must be suppressed because it was not voluntary, as the product of a two-stage interrogation which taints the entire statement. Al-Amin talked at Sergeant Silva, unprompted and almost non-stop for an hour in the pre-Miranda session. When Sergeant Silva finally interrupted Al-Amin's stream of consciousness declarations to read him his Miranda warning, Al-Amin stated, "So, this is where the official interview starts." Sergeant Silva read the Miranda warning at 4:34:19. Al-Amin acknowledged the warning with a verbal "yes," indicating that he understood. After Al-Amin was Mirandized, the interrogation continued. The R&R determined the statement made post-Miranda was after a knowing and voluntary waiver, and was not in response to coercive police questioning or conduct by Sergeant Silva. After de novo review, listening to both the pre- and post-Miranda interrogations, Gov't Ex. 2, the Court agrees with the reasoning in the R&R and the conclusion that Al-Amin's statements to Sergeant Silva after receiving his Miranda rights were voluntary and not in response to coercive two-stage interrogation. The statement will not be suppressed.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Al-Amin's Objection [Docket No. 46] to the Report and Recommendation is **SUSTAINED IN PART** and **DENIED IN PART**;

2. Government's Objection [Docket No. 48] to the Report and Recommendation is **SUSTAINED IN PART** and **DENIED IN PART**;

3. The Report and Recommendation [Docket No. 45] is **ADOPTED IN PART** and

**DECLINED IN PART**;

4. Al-Amin's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 20] is **DENIED**; and,

5. Al-Amin's Motion to Suppress Statements [Docket No. 19] is **DENIED** consistent with this Memorandum Opinion & Order.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: April 23, 2019.